# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKY L. RODRIGUEZ,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | 1:08-cv-01444-JLT<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY COMPLAINT (DOC. 1)<br><br>ORDER DIRECTING THE ENTRY OF JUDGMENT FOR DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF VICKY L. RODRIGUEZ |

In this action, Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying her application for Supplemental Security Income (SSI) benefits and Disability Insurance Benefits (DIB). In her of September 29, 2005 application for benefits, she claimed to have been disabled since June 30, 2005, due to a depressive disorder. (A.R. 111-14, 338-42, 15.) The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).

The decision under review stems from that issued by Social Security Administration (SSA) Administrative Law Judge (ALJ) Bert C. Hoffman, Jr., dated March 28, 2008. (A.R. 13-20). The ALJ issued his decision after a hearing held on January 7, 2008, at which Plaintiff appeared and testified. (A.R. 13, 24-53). The Appeals Council denied Plaintiff's request for review on September 3, 2008 (A.R. 3-5), and thereafter Plaintiff filed her complaint in this Court

1

on September 25, 2008. Briefing commenced on June 1, 2009, with the filing of Plaintiff's opening brief. Defendant filed opposition on June 22, 2009, and Plaintiff's reply was filed on July 7, 2009. The matter has been submitted without oral argument.

I.    Jurisdiction

Plaintiff timely filed her complaint on September 29, 2008, less than sixty days after the mailing of the notice of decision on or about September 3, 2008. (42 U.S.C. §§ 1383(c)(3) and 405(g))

II.    Standard and Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  When conducting its review, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401.

The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It may not simply isolate a portion of evidence that supports the decision. It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner. Instead, the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's obligation to resolve any conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human

2

1  Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court

2  concludes that the ALJ did not use the proper legal standard, the matter will be remanded to

3  permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir.

4  1987).

5  III.    Disability

6          A.      Disability Analysis

7          In order to qualify for benefits, a claimant must establish that she is unable to engage in

8  substantial gainful activity due to a medically determinable physical or mental impairment which

9  has lasted or can be expected to last for a continuous period of not less than twelve months. 42

10 U.S.C. § 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such

11 severity that the claimant is not only unable to do the claimant's previous work, but cannot,

12 considering age, education, and work experience, engage in any other kind of substantial gainful

13 work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v.

14 Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability initially is on

15 the claimant, who must prove that the claimant is unable to return to his or her former type of

16 work.  If met, then the burden shifts to the Commissioner to identify other jobs that the claimant

17 is capable of performing considering the claimant's residual functional capacity ("RFC"), as well

18 as her age, education and last fifteen years of work experience. Terry v. Sullivan, 903 F.2d 1273,

19 1275 (9th Cir. 1990).

20         The regulations provide that the ALJ must make specific sequential determinations in the

21 process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity

22 since the alleged date of the onset of the impairment, 2) whether, solely on the basis of the

23 medical evidence, the claimed impairment is severe, that is, of a magnitude sufficient to

24 significantly limit the individual's physical or mental ability to do basic work activities; 3)

25 whether, solely on the basis of medical evidence, the impairment equals or exceeds in severity

26 certain impairments described in Appendix I of the regulations; 4) whether the applicant has

27 sufficient RFC, defined as what an individual can still do despite limitations, to perform the

28 applicant's past work; and 5) whether on the basis of the applicant's age, education, work

experience and RFC, the applicant can perform any other gainful and substantial work within the economy. See 20 C.F.R. § 416.920.

### B. The ALJ's Findings

The ALJ found that Plaintiff's depressive disorder was severe but that it did not meet or medically equal a listed impairment. Likewise, the ALJ found that Plaintiff retained the RFC to perform a full range of work at all exertional levels as long as it involved only limited public contact. Although the ALJ found that Plaintiff could not perform her past relevant work as a fast food restaurant worker and child care provider, because they involved frequent public contact and interaction with others, he found that she was a younger individual on the alleged disability date, had a high school education, was able to communicate in English, and had the RFC to perform work at all exertional levels. The ALJ determined that because her non-exertional limitations had little or no effect on the occupational base of unskilled work at all exertional levels, there were jobs in significant numbers that she could perform that did not involve public contact or frequent interaction with others. Therefore, under the framework of § 204.00 of the Medical-Vocational Guidelines, the ALJ determined that Plaintiff was not disabled. (A.R. 15-20.)

IV.     Plaintiff's Contention

Plaintiff's sole argument is that the ALJ erroneously evaluated the opinions of treating psychiatrist Gabriela Obrocea, M.D., Ph.D. Plaintiff contends that, once the ALJ determined that Dr. Obrocea's opinions were not entitled to controlling weight, he was required to consider the length of the treatment relationship, the frequency of the examinations and the nature and extent of the treatment relationship to determine the proper weight to give to the opinions. (Op. Brf. Pp. 8-9.) Plaintiff argues further that, contrary to the ALJ's conclusion, Dr. Obrocea's opinions were consistent with the record as a whole, which reflected sustained periods of significant limitations from depression and only brief periods of improvement. (Id. pp. 9-10.) Plaintiff seeks to have this Court credit the opinions of Dr. Obrocea and direct an immediate award of benefits. (Brf. p. 11.) In the reply, Plaintiff argues that the ALJ's reasons were not sufficiently specific.

V.      Administrative Record

A.    Medical Evidence

In May 2004, progress notes from Shafter Community Health Center indicated that Plaintiff felt better and her symptoms of panic attacks had improved over the past two weeks. The notes indicate that her memory and cognition were intact, her affect was stable, and she had no suicidal ideations or hallucinations.  She reported that she was babysitting for her sister. Plaintiff reported that she did not want to take her medication. The clinician's impression was panic disorder with agoraphobia. The strategy was to limit and schedule worry time, with follow-up in two weeks. (A.R. 336-337.)

On August 5, 2005, Ken W. Pratt, MFT Intern with Kern County Mental Health (KCMH), completed an assessment of Plaintiff, who reported panic attacks lasting for five to ten minutes about once a week, decreasing in frequency over the past year.  Plaintiff reported that she had been doing better since she began taking Paxil in January 2005, but she was presently out of medication. Pratt noted that Plaintiff was properly groomed, behaved well and she exhibited normal speech.  Although Pratt noted that Plaintiff was "somewhat depressed," she made good eye contact and responded timely to questions.  Pratt determined that Plaintiff's intellectual functioning was average but that she appeared to have "fair to poor" insight and judgment. Pratt diagnosed major depressive disorder, recurrent, severe, without psychotic features, panic disorder without agoraphobia, with a global assessment of functioning (GAF) score of 55. Pratt recommended Plaintiff to undergo an evaluation to determine her need for medication and to enegage in therapy to help her with the depression and panic attacks. (A.R. 272-74.)

On September 16, 2005, Gabriela Obrocea, M.D., staff psychiatrist at KCMH, signed a psychiatric and medication evaluation of Plaintiff that was based on an examination that occurred on August 15, 2005. (A.R. 299-301, 271, 268-70.) At that time, Plaintiff reported to Dr. Obrocea's that her father and several cousins suffered from depression.  She complained of having been depressed for two weeks which was characterized as causing her to cry "all the time." She reported also that she had anxiety and worried her health, her parents' health and about dying from a heart attack.  She said that she suffered panic attacks that lasted about a minute and involved her having palpitations, racing heartbeat, sweaty palms and difficulty

breathing. She reported that she had "somewhat pessimistic thoughts" and hypersomnia, sleeping 12 hours out of 24. (A.R. 299.) Plaintiff related a history of having been depressed about a year previously. She stated that Paxil, her prescribed medication, made her feel tense and restless and that she "discontinued the Paxil on her own" in 2005. She said that she suffered withdrawal symptoms with myalgias, arthralgias, and numbness and tingling in her hands and feet. (A.R. 299.) Plaintiff denied any hospitalization for psychiatric complaints or ever having any suicidal thoughts in her life. She reported that she had graduated from high school as an average student and planned a college program involving computers. Although she was shy and withdrawn in school, she reported that after leaving school she had more friends. (A.R. 299-300.)

Dr. Obrocea conducted a mental status examination of Plaintiff that revealed that she was mildly overweight, was alert and oriented in all spheres and was cooperative. She exhibited normal psychomotor activity and speech with increased latency of response and a somewhat monotonous, slowed rate. Dr. Obrocea found Plaintiff's affect was "mood and thought congruent" and somewhat constricted but that she had no lability of affect. Dr. Obrocea's felt that Plaintiff had no perception abnormalities except depersonalization and derealization phenomena that occurred as hypnaogic phenomena when she fell asleep. (A.R. 299-300.) Plaintiff's thought process was coherent and goal directed, her insight was good, and she had the ability to abstract and handle hypothetical situations well. (A.R. 300.)

Dr. Obrocea noted that Plaintiff's depression was atypical and was characterized by "hyperphagia and hypersomnia and anergic, but with preservation of hedonic symptoms." (A.R. 301.) Dr. Obrocea's diagnosis was "Dysthymia. Rule out Major Depressive Disorder, Severe, with Atypical Features. Rule out Bipolar Affective Disorder, Type II, Depressed, Severe, without Psychotic Features; Rule out Double Depression. Panic Disorder without Agoraphobia." Dr. Obrocea determined that Plaintiff's GAF score was 35 to 45. (A.R. 301.) Dr. Obrocea recommended a full laboratory work-up to address reversible causes for depression, for Plaintiff to begin taking Wellbutrin SR, with the dosage to be increased within two weeks and for Plaintiff to return for follow-up in two weeks. (A.R. 301.)

On October 18, 2005, after an examination on October 17, 2005, Dr. Obrocea completed

a short-form evaluation of Plaintiff for mental disorders. (A.R. 296-98.) She noted that Plaintiff was disheveled, with retarded motor activity, slow speech, and, although she was cooperative, she demonstrated apathetic behavior. She was oriented in all spheres, her concentration was slightly distracted, her memory was normal and her intelligence was average but her mood was anxious, depressed, fearful, labile, and dysphoric. Dr. Obrocea noted that Plaintiff had no hallucinations or illusions. Her thought process involved blocking, nihilistic delusions, and obsessions but her judgment was intact. Dr. Obrocea's opined that Plaintiff's ability to understand, remember and carry out complex instructions and to complete a normal workday and workweek without interruptions from psychologically based symptoms were poor. On the other hand, Dr. Obrocea believed that Plaintiff's ability to understand, remember, and carry out simple instructions, to maintain concentration, attention, and persistence, to perform activities within a schedule and maintain regular attendance, and to respond appropriately to changes in the work setting were all fair. Dr. Obrocea stated that Plaintiff's prognosis was guarded. She believed that Plaintiff's predisposing factors included genetic vulnerability, precipitating life stressors, and perpetuating side-effects from medication. Dr. Obrocea diagnosed Plaintiff with double depression and BPAD II, severe without psychotic features.

In later 2005, Dr. Obrocea's psychiatric progress notes (A.R. 258-67) reflect that she adjusted Plaintiff's medications. She increased the dosage of Wellbutrin (A.R. 267, 265), recommended that Plaintiff begin taking a mood stabilizer (A.R. 266-67), prescribed Klonopin and Synthroid (A.R. 265) and noted other adjustments. (A.R. 263). Plaintiff reported that she felt a little better with a mood that brightened when she went out, although she was easily irritated and had poor concentration and low energy. (A.R. 266 [August 29, 2005].) In late October 2005, Plaintiff denied any experience of anxiety, fearfulness, or sadness, and reported that the depression was lifting. (A.R. 262.). By December Plaintiff reported that her energy had increased and she went walking for thirty minutes at night. (A.R. 260 [December 9, 2005]) She reported also that her concentration had been "ok." Id. On December 27, 2005, Plaintiff reported feeling a little better and less depressed. (A.R. 258 [December 27, 2005]). Plaintiff's reported difficulties of falling asleep (A.R. 264, 260) were followed by improvement to sleep that was "ok." (A.R.

258).

A survey of the objective signs observed during Dr. Obrocea's evaluations of Plaintiff in late 2005, reflects that Plaintiff exhibited neat or mildly disheveled grooming, normal or slow speech, good or intermittent eye contact, unremarkable or decreased psychomotor response, cooperative behavior, sad or depressed, and then, euthymic mood, appropriate affect, unremarkable or slowed thought process, unremarkable thought content, average intelligence, good or fair insight, memory, and judgment, and intact concentration. (A.R. 266, 264, 262, 260, 258.) The response to treatment ranged from mildly improved or minimally better (A.R. 267 [August 2005], 265 [October 2005], 259 [December 27, 2005]) to much improved (A.R. 263 [October 25, 2005], 261 [December 9, 2005]).

In February 2006, a case worker completed a periodic plan of care progress note and stated that at a meeting with Plaintiff, Plaintiff indicated that she was doing well, was very active, went out with cousins and sometimes her friends, and continued to be interested in returning to school. Plaintiff reported that the medication was helping her deal with her mental state. Although Plaintiff reported that she did not want to work in fast food restaurants all her life, that these were places for her to start since she needed a source of income. The plan was to link Plaintiff to the career services center and other services that would provide information and training opportunities. Also, the case worker agreed to obtain information for Plaintiff regarding attending Bakersfield College. (A.R. 257.)

In March 2006, non-examining state agency physician, Charles Lawrence, Ph.D., a consultant in psychology, completed a psychiatric review technique covering June 30, 2005, through March 9, 2006, and a mental RFC assessment. (A.R. 302-14, 317-19.) Dr. Lawrence determined that Plaintiff had affective and anxiety-related disorders (§§ 12.04 and 12.06), including depressive disorder, not otherwise specified, and panic disorder without agoraphobia. Dr. Lawrence noted that there was no documentation in the longitudinal record of signs or symptoms of bipolar disorder, which was listed as a disorder to be ruled out in the psychiatric evaluation of August 15, 2005. (A.R. 305, 307.) Dr. Lawrence concluded that Plaintiff was mildly limited in the activities of daily living, that she had difficulties in maintaining social

functioning, and that she was moderately limited in maintaining concentration, persistence, and pace (A.R. 312.) The evidence did not establish "C" criteria. (A.R. 313.) Lawrence concluded that Plaintiff's only limitations were moderate limitations of the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting. Dr. Lawrence believed that Plaintiff would be able to follow instructions and persist on tasks to completion. She might have difficulty coping with a pressured pace, but she would be able to maintain an adequate, if not rapid, pace. Dr, Lawrence opined that Plaintiff could have difficulty coping with frequent changes in routines, but she could tolerate occasional changes. Dr. Lawrence believed that Plaintiff would be able to maintain a regular schedule, she could interact effectively with others and she would be sensitive to environmental hazards. Dr. Lawrence concluded that there were no substantial mental limitations. (A.R. 318-19.)

Dr. Lawrence's consulting notes stated that there were important inconsistencies in the records of evaluation and treatment. (A.R. 314.) The medical history reflected panic disorder successfully treated with Paxil in 2004, followed by returning symptoms in 2005 after Plaintiff stopped taking the Paxil early that year. At the time, Plaintiff had explained that she stopped Paxil because of side-effects but she had reported that she suffered no side-effects from the drug in December 2004. (Id.) Dr. Lawrence noted that Plaintiff's complaints in 2005 related to panic attacks and depressive symptoms and that the examining psychiatrist had diagnosed dysthymic disorder and panic disorder without agoraphobia.  Also, Lawrence noted that Plaintiff was treated with Wellbutrin. (A.R. 314.)

Dr. Lawrence was concerned that the psychiatrist had submitted an evaluation with different diagnoses but with no information or explanation given for why the diagnoses had changed. (A.R. 314.) The medication used to treat Plaintiff was not identified. Likewise, Dr. Lawrence noticed that some symptoms mentioned in the evaluation, such as obsessions, thought blocking, and nihilistic delusions, were not reflected in the records of the evaluation or in any previous records. Although, the examining psychiatrist concluded that Plaintiff would have great

difficulty with complex instructions and completing a work day and work week, Dr. Lawrence

found no information to support this conclusion. Further, the psychiatrist's evaluation did not

describe or provide evidence of ongoing treatment and it did not describe the response to

treatment. In view of Plaintiff's very favorable response to treatment in the past, and considering

the absence of any reason to suggest that Plaintiff could not be treated effectively, Dr. Lawrence

concluded that Dr. Obrocea's proposed limitations could not be adopted. (A.R. 314.)

Dr. Lawrence identified problems with the credibility of the information concerning

Plaintiff's activities of daily living (ADL). (A.R. 314.) Dr. Lawrence noted that all of the ADL

forms were completed by Plaintiff's mother and all of the comments in the three forms in the

record were virtually identical.  He noted also that on one ADL (the report of October 28, 2005),

the author initially referred to the Plaintiff as "I" but soon began referring to her as "She."  Also,

the back of the form was signed by the mother where the person completing the form was

instructed to sign.  Id.

Further, some of the reported symptoms were inconsistent with Plaintiff's diagnosis and

were not reflected in the treatment notes. For example, Plaintiff's mother reported that Plaintiff

was so forgetful that she forgot to take her medication and forgot whether she had taken it or not.

However, Plaintiff 's diagnosis would not produce major deficits of memory. Plaintiff's mother

reported that Plaintiff would not bathe in her own bathroom or go anywhere unaccompanied, but

such intense, agoraphobic characteristics were not reflected in treatment or evaluation records.

Instead, the diagnosis consistently had been panic disorder without agoraphobia. (A.R. 314.)

Also, Plaintiff's mother reported anger and other problems that were not reflected in the

treatment notes. (Id.) Dr. Lawrence concluded that the ADL forms greatly exaggerated Plaintiff's

functional limitations, and he gave them minimal weight in assessing Plaintiff's mental

impairment. (Id.)

Psychiatric progress notes from 2006 reflect that Plaintiff made initial improvement.

Then in the middle of the year she had greater difficulty followed by further improvement

towards the end of 2006. (A.R. 223-55.)

During 2006, generally Plaintiff presented with mild or normal objective signs, including

mildly disheveled or disheveled grooming, normal speech, good eye contact, unremarkable psychomotor response, cooperative behavior, sad and depressed mood, appropriate affect, unremarkable thought process and content, good insight, judgment, and memory, and intact concentration. (A.R. 255, 248, 243, 241, 235, 232, 230, 228, 226, 224.)[1] In March 2006, Dr. Obrocea noted a mild setback due to Plaintiff's break-up with her boyfriend, accompanied by distractibility. (A.R. 256.)[2] By the end of March 2006, Plaintiff reported that she felt mentally stable with decreased depression, although she was anxious about having been notified that her medical benefits were expiring soon. (A.R. 251.) Plaintiff stated in a periodic review that she wanted to go to school but her priority was to get a job. Psychiatrist Laura Diaz-Winterset noted Plaintiff's need for additional guidance and support to encourage change and reduction of symptoms. Likewise, Dr. Diaz-Winterset noted that Plaintiff needed assistance with gaining job skills and that the progress she was making in developing coping skills should be monitored. (A.R. 254.) Plaintiff was to be given help in job hunting and would be enrolled in training programs or college to increase her education and skills. (A.R. 250-51.)

In April 2006, Plaintiff experienced mood swings, racing thoughts, frustration, and anxiety regarding her parents' health and her inability to find a job. She reported that she anticipated being discontinued from "medical" due to "the age out process," and she worried what would happen to her if she had to lose mental health services. She reported that she was in the process of appealing the denial of her SSI application. (A.R. 247-8.) When evaluated in early May 2006, Plaintiff had not been taking her medications for a month because she had been denied eligibility for the medication program. She reported that this had prompted severe depression and thoughts of death and wanting to die. (A.R. 243.)

By June 2006, without medication, Plaintiff reported that she was minimally improved,

---

[1] Speech was slow, and psychomotor was slowed or decreased in April, May, June, August, September, October, and November 2006. Thought process was slowed in May and October 2006. (A.R. 248, 243, 288, 290, 241, 286, 232, 230, 228, 224.) Mood was also anxious in May and October 2006, and there was mild dysphoria in November 2006. (A.R. 243, 228, 226.) Insight and memory were fair in May and November 2006. (A.R. 243, 226.)

[2] Plaintiff reported that despite having broken up with her boyfriend, her energy was good (A.R. 255), but Dr. Obrocea reported that Plaintiff complained of low energy and fatigue (A.R. 256).

with improved sense of joy and pleasure and varying energy; Dr. Obrocea noted minimal improvement with treatment. (A.R. 241-42, 235-36.)

On June 6, 2006, Dr. Obrocea completed a short-form evaluation for mental disorders. (A.R. 279-81.) Plaintiff was disheveled, with retarded motor activity, slow speech, and guarded and apathetic behavior. Dr. Obrocea noted that Plaintiff was oriented in all spheres, concentration was mildly impaired, memory was moderately impaired, intelligence was above average, mood depressed, sad, anxious, and angry. Dr, Obrocea found that Plaintiff's affect was appropriate and congruent with her mood and thought content. Also, her thought process was slowed, with obsessions and suicidal fears. Nevertheless, Dr. Obrocea found Plaintiff's judgment to be intact judgment. She noted that Plaintiff and no history of alcohol or drug abuse. Dr. Obrocea believed that Plaintiff had made progress with treatment but currently had suicidal ideation and increased depression. Therefore, Plaintiff's prognosis was guarded. (A.R. 281.)

Dr. Obrocea concluded that Plaintiff had poor ability (could not usefully perform or sustain the activity) to understand remember and carry out complex instructions, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and respond appropriately to changes in a work setting. Dr. Obrocea found that Plaintiff had a fair ability to understand, remember, and carry out simple instructions and to maintain concentration, attention and persistence. (A.R. 281.) Plaintiff was able to manage her own funds in her own best interest. (Id.)

In July, Dr. Diaz-Winterset noted that, due either to side-effects or problems with access to medications, Plaintiff was having several medication issues and increased symptoms. (A.R. 234.) In August 2006, Dr. Obrocea opined that Plaintiff was "maybe minimally better in terms of suicidality" and noted that Plaintiff reported that she felt "a little better." (A.R. 233.) Plaintiff reported that she was only taking one Wellbutrin and had discontinued the Paxil because of side-effects. At the time, her focus and concentration were low. (A.R. 232.)

In September 2006, Plaintiff's compliance with medication was again good, and she reported good energy. Although she reported that she had broken up with her boyfriend, she was not fearful and she socialized in Los Angeles. (A.R. 230.) In October, Plaintiff reported feeling

sad and depressed for two days in the past week but that her mood was "ok for 1 week." She expressed thoughts of hopelessness and low self-esteem. (A.R. 228.) However, she reported that she started playing softball, practicing three times a week and playing two games a week. In addition, she reported that she had stayed in the hospital with a cousin who had attempted suicide by an overdose of pills. (A.R. 229.)

In early November 2006, Plaintiff reported fair compliance with medication and that she was feeling better and that her anxiety was subsiding. She reported that she drinking once per month and that drinking had made her depression and anxiety worse. Dr. Xiaoyin Zhou recommended education and programming regarding potential alcohol abuse problem. (A.R. 226-27.) He noted that Plaintiff's response to the new medication regimen was fast, good, and involved noticeable improvement. (A.R. 227.) At the end of November, with good medication compliance, Plaintiff's energy was much improved, her sense of joy, pleasure, and enjoyment were good, and her grooming was neat. (A.R. 224.) Dr. Obrocea found that her response to treatment was very much improved. (A.R. 225.) The December 5, 2006 periodic plan of care reflected that Plaintiff's goals were to get out more and receive SSI benefits. (A.R. 223.)

In 2006, Dr. Obrocea consistently assessed Plaintiff as severely disabled and unable to work. (A.R. 256, 249, 244, 242, 236, 233, 231.) Dr. Obrocea's diagnosis changed in May 2006 from BPAD II, depressed, major depressive disorder (A.R. 256, 249) to double depression, major depressive disorder, recurrent, severe (A.R. 244.) In June 2006, Dr. Obrocea diagnosed double depression, major depressive disorder, severe, with psychotic features. (A.R. 236.) In September 2006, in addition to double depression, the doctor diagnosed panic attacks, but the depression was noted to be "currently mild." (A.R. 231.) In October 2005, when Plaintiff reported playing softball five times a week and staying with her cousin in the hospital, Dr. Obrocea added panic disorder with agoraphobia to the diagnosis. (A.R. 229.)

On November 30, 2006, non-examining state agency psychiatrist Dr. Marina C. Vea opined that Plaintiff was capable of performing simple, repetitive tasks. (A.R. 320-21.) Her consulting notes (A.R. 315-16) indicated that the examination by Dr. Obrocea on August 15, 2005, produced unremarkable findings except that Plaintiff was depressed. (A.R. 315.) Dr. Vea

noted that a mental status exam that appeared to have been performed on October 17, 2005 (two months later) reflected Plaintiff's fair status in four areas and poor ability only with respect to complex tasks and completing a work day or work week. At this time, the diagnosis given Plaintiff was double depression, BPAD without psychotic features. Dr. Vea noted that Dr. Obrocea started Plaintiff on Wellbutrin and by the time of the evaluation of Plaintiff on October 17, 2005, had seen Plaintiff for only two months. (Id.)

Also, Dr. Vea noted the inconsistencies that Dr. Lawrence had discussed and said she would not repeat them. (A.R. 316.) She agreed that Plaintiff could perform simple, repetitive tasks and agreed with Dr. Lawrence's psychiatric review technique form and mental RFC assessment.

Psychiatric progress notes from KCMH treatment in 2007 reflect objective signs and disability assessments that were generally consistent with those from in 2006. (A.R. 220 [February 2007, tearful affect, fair insight, memory, and judgment, mildly impaired attention or concentration]; 211-12 [improved objective signs]; 203-04; 192-93, 184-85, 176-77, 170-71.)

Initially in 2007 the improvement with treatment that began in 2006 continued. (A.R. 220-21 [In February 2007, Plaintiff reported being fifty per cent better, tolerating medications well, and feeling good playing basketball or babysitting her niece; Dr. Padhy or Padry assessed that Plaintiff was improving well]; 218 [Plaintiff reported doing fine, visiting and going out with family but staying home a lot].)

Collateral progress notes from late February through mid-March 2007, revealed that Plaintiff's mother had found an attorney to work on Plaintiff's SSI case. Further, the service provider had spoken with a registered nurse in the authorization department and Plaintiff's case did not demonstrate the severity expected in a "short doyle" case. The note instructed that if the client was severely mentally ill, the documentation must provide evidence of it. (A.R. 214, 216.) At Plaintiff's next evaluation, which occurred one week later on March 23, 2001, she reported doing "worse," with increased anxiety, excessive sleep, changing moods and racing thoughts. However, the objective signs were milder than they had been in February; her speech was no longer slow and her attention and concentration were then intact. Although she remained tearful,

her affect was constricted. (A.R. 211.) Dr. Zhou's plan was to target the Plaintiff's anxiety by adjusting her medications. (A.R. 212.)

On April 16, 2007, the clinician reviewed Plaintiff's case and noted concern that it would be closed due to the lack of documentation of the severity of her illness. The note indicated that this fact "would need to be informed to client" and that the client might be feeling very ill, but she might not be expressing all she truly felt. (A.R. 202.) The matter was subsequently submitted to the authorization department for review and assistance with mental health services. (A.R. 199.) On April 30, 2007, a family counseling session was held with Plaintiff and her family, who were informed of the proceedings of the case, and the mother was told "the additional information that is requested from them." (A.R. 198.) On May 2, 2007, Plaintiff and her family met to complete a treatment plan. (A.R. 197.)

A periodic assessment of April 23, 2007, by P. Pelayo-Arredondo, MSW, RS III, was based on information from both Plaintiff and her mother although Plaintiff's level of participation was minimal with much of the information being derived from Plaintiff's mother. The social worker noted that it was difficult to assess Plaintiff because she was reserved, quiet, and tended to "minimalize" her information. (A.R. 205-09, 208.) The report indicates that Plaintiff could not babysit her niece alone, could not go out alone, had become isolated, was unable to work because of very poor memory and concentration. The report noted further that Plaintiff had failed to control her anxiety and needed to participate in the community and in activities of daily living, such as cooking, cleaning, and attending to medical appointments without prompting. (A.R. 205-07.)

Plaintiff reported panic attacks in May 2007 during a time when her brother and his children had moved into the home of Plaintiff's parents, where Plaintiff resided. (A.R. 203-04.) Dr. Obrocea assessed poor response to treatment despite improvement of objective signs since the February 2007 exam (insight, memory, and judgment had improved to good, and attention and concentration were intact). In late May, Plaintiff was asked to begin attending group counseling to develop coping skills and reduce stressful situations. She failed to appear at the first session and there is no record that she attended any. (A.R. 194, 189) Plaintiff's mother

reported that Plaintiff was nervous about medications and Plaintiff's mother expressed concern about continuing and then discontinuing the medications because Plaintiff was very depressed. (A.R. 189, 186.) The mother reported using "home remedies" to control Plaintiff's anxiety. (A.R. 187)

In early June 2007, Plaintiff's mother contacted KCMH and acted in an "uncooperative and slightly hostile" manner. She wanted Dr. Obrocea to change Plaintiff's medications because Plaintiff was having anxiety attacks. (A.R. 188.) Plaintiff reported that she was anxious, suffered memory problems, was frustrated with her depression, that she had low energy, and negative thoughts. She reported that she could drive. Her objective signs remained generally improved from those in February, with appropriate affect and good insight and judgment, intact concentration and attention, but intermittent eye contact and only fair memory. Response to treatment was poor. (A.R. 192-93.) At the end of June, Plaintiff reported "better" compliance with medication, but continuing symptoms of anxiety and difficulty falling asleep. Plaintiff stated that she was afraid of becoming addicted to Klonopin. However, the doctor noted Plaintiff to be neatly groomed with good insight, memory and judgment and intact concentration. Dr. Obrocea felt that Plaintiff's response to treatment was minimally better and adjusted her medications. (A.R. 184-85.)

Plaintiff began individual counseling sessions in July 2007 to address negative thoughts. (A.R. 179.) Plaintiff failed to appear on July 19, 2007. In August 2007, Plaintiff reported less depression and that she was better. She reported that she was playing softball twice a week and babysitting for her niece. She stated that her sleep and appetite were ok. Her memory, judgment, and insight were good and her attention and concentration were intact. Dr. Obrocea noted that this was "minimally better" response to treatment. Dr. Obrocea noted that Plaintiff was not crying at home but was still troubled by negative thoughts. (A.R. 176-77.)

On September 24, 2007, Plaintiff reported that "staying on" the medications had helped her, but she was afraid that if she stopped the medications, she would be suicidal. (A.R. 178, 174.) In early October, she had run out of medications and felt anxious. (A.R. 172.) She admitted that she was afraid to leave home because of fear of rejection, criticism, and failure, and that she

16

thought about death. (A.R. 169, 174.)

In October, Plaintiff met with a counselor to discuss options for obtaining medications if her case was transferred to her primary care physician. (A.R. 173.)  On October 4, 2007, Plaintiff reported to Dr. Obrocea that she was playing softball and had some increased anxiety because she had run out of medications for a week and felt fearful. Dr. Obrocea still marked "fair" medication compliance.  Also, Dr. Obrocea noted that Plaintiff's sleep was ok and that the objective signs were basically consistent. Dr. Obrocea noted that Plaintiff was worried because she had no income. (A.R. 170-71.)  Plaintiff reported to her therapist the day before that she had been babysitting for her brother's children and was being paid by DHS.  (A.R. 172.)  However, she reported that she was recently told that she could no longer be paid for babysitting because she did not pass her background check.  Id.

On October 4, 2007, Dr. Obrocea completed a medical statement concerning bipolar disorder and related conditions for Social Security Disability claim. (A.R. 276-78.) The diagnosis was double depression, with a GAF score of 40. Plaintiff suffered intermittently or persistently with anhedonia, pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, hallucinations, delusions, paranoid thinking, and panic attacks. Dr. Obrocea opined that Plaintiff was mildly restricted in the activities of daily living but that her difficulty in maintaining social functioning was marked. Dr. Obrocea found that Plaintiff suffered deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner in work settings or elsewhere. She found also that Plaintiff experienced repeated episodes of deterioration or decompensation in a work or work-like setting which caused Plaintiff to withdraw from the situation or experience increasing symptoms, which might include deterioration of adaptive functioning. Dr. Obrocea opined that work limitations related to Plaintiff's psychiatric state included marked impairment of the ability to complete a normal workday and workweek without psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to travel

in unfamiliar places or use public transportation. (A.R. 277-78.) Plaintiff was moderately limited in the ability to remember locations and work-like procedures; to understand, remember, and carry out detailed instructions (but not limited with respect to short and simple instructions); to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with and proximity with others without being distracted by them; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others. (A.R. 277-78.)

Medications listed in 2007 included Clonazepam, Buproprion, Temazepam, Levothyroxin, Lamictal and, Klonopin (A.R. 218, 212, 193; 294 [August 2005 through June 2006].)

B.     Plaintiff's Testimony

Plaintiff testified that she last worked in the middle of 2005 as a cooker and cleaner at Burger King. (A.R. 29.) She reported that she quit after six months because of her problems. Id. She testified also that with her handicapped mother's help, she had babysat her infant niece from the beginning of 2006 until the middle of 2007 for her brother, working eight hours a day, five days a week, diapering and feeding the child, being paid by the state, and making $8,000 in 2006. (A.R. 30, 34-35.) Plaintiff's psychiatrist encouraged her to babysit, but Plaintiff stopped the job because of a problem with fingerprinting. (A.R. 42.) Nevertheless, Plaintiff testified that she could not handle the babysitting anymore. Id.

Plaintiff testified that she did housecleaning to help her mother, who had arthritic knees, diabetes and was overweight. (A.R. 33-34.) She stated that she had a valid driver's license and

last drove in mid-2007. (A.R. 34.) Plaintiff was still in Dr. Obrocea's care[3], and Plaintiff claimed that her depression had not improved at all and that she had told that to the doctor. (A.R. 37.) She testified that there had been no change detected with any adjustment of medicine and that she suffered no side-effects from her medication. (A.R. 37, 40.) Plaintiff denied having been involved in any activity in which she left home to go somewhere to do something. (A.R. 37.) She did nothing for recreation and had no hobbies. (A.R. 41.) She had tried softball and played on her brother's co-ed team for about a month in six games, but she could not handle being around a lot of people or a big crowd. (A.R. 44-45.) She testified that she stopped before the season ended. (A.R. 46.)

Plaintiff testified that her father or mother took her to her doctor's appointments. (A.R. 46.) She testified that she could not perform a job that required interaction with others because she had trouble concentrating and focusing. (A.R. 39.) The very last time she drank alcohol was in 2005. (Id.) She spent her days sleeping and watching television. (A.R. 39-40.) In October 2007, Plaintiff testified that she had an interview for a job but failed to keep it because she felt overwhelmed. (A.R. 43.) She reported that she could not remember the job. Id.

Plaintiff testified that she felt concerned about people being critical of her. (A.R. 43) She testified that she had gained about forty pounds in the past two years. (A.R. 43-44.) However, she did not know how much she weighed at the time of the hearing because she hadn't weighed herself. (A.R. 48) Plaintiff produced her drivers license which noted that in March 2005, Plaintiff was 5 feet tall and weighed 208 pounds. Id.

Plaintiff testified that she was concerned because she had already stopped receiving medication benefits. (A.R. 47.) She reported that her brother helped her buy the medication "but it's kind of hard to get it." Id. She did not leave the house except for doctor's appointments. (A.R. 49-50.)

VI.    The ALJ's Treatment of the Treating Psychiatrist's Opinion

---

[3] Although the transcript refers to a "Dr. Brayen [phonetic]," Plaintiff's testimony that she had been seeing the doctor for about three years and the phonetic renderings warrant an inference that the reference was to Dr. Obrocea. (A.R. 36.)

A.   Legal Standards

The standards for evaluating treating source's opinions are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). With respect to proceedings under Title XVI, the Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.

The principles governing consideration of the legal sufficiency of an ALJ's reasoning were set forth in Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007):

> The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 830, quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes [v. Bowen], 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.1988). Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

In Orn, the court sets forth a path of analysis that conforms to the regulations, wherein the ALJ is first required to determine whether or not the opinion of the treating physician will be given controlling weight, which in turn requires consideration of whether or not the treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Orn, 495 F.3d at 631.

If not given controlling weight, the opinion is subject to consideration in light of other specified factors, including the nature and extent of the treatment relationship, the amount of relevant evidence that supported the opinion, the quality of the explanation provided, the consistency of the opinion with the record as a whole, the specialty of the doctor providing the opinion, and other factors such as the degree of understanding of the Commissioner's disability programs and their evidentiary requirements and the degree of his or her familiarity with the other information in the record. Orn, 495 F.3d at 631.

B.    Analysis of the ALJ's Reasoning

The Court will consider the entire decision of the ALJ in evaluating the legal sufficiency of the ALJ's reasoning.

The ALJ noted that Plaintiff had earned several thousand dollars in 2005 and eight thousand dollars in 2006; thereafter, Plaintiff had no earnings. (A.R. 15.)

The ALJ reviewed Plaintiff's medical history for the period September 2005 (several months after the alleged onset date of June 30, 2005), until October 2007 (shortly before the hearing held in January 2008). (A.R. 15-17.) The ALJ detailed the mild findings found by treating psychiatrist Dr. Obrocea in September 2005 (A.R. 16); the opinion of Dr. Lawrence, the consulting examiner, from March 2006 and the reasoning underlying that opinion (A.R. 16-17); Plaintiff's own reports in March and April 2006 that she wanted to get a job and go to school, and that she planned to apply for two jobs per week until she was able to locate work (A.R. 16); the annual assessment of June 2006 stating that Plaintiff was able to attend to activities of daily living, make and maintain good relationships with her friends and family, was not a danger to herself, and did not have a medical condition (A.R. 16); Plaintiff's reports in October 2006 that

21

she was playing softball (A.R. 16); notes of improvement in symptoms in November 2006 and February 2007 (A.R. 16); the contemporaneous progress notes containing only mild findings, such as depressed mood or flat affect, good eye contact, insight, judgment, and memory, normal thought processes and intact concentration, and cooperative behavior (A.R. 16); Plaintiff's ability to drive (A.R. 18); the annual assessment of April 2007, in which Plaintiff was reported to have been attending to normal activities of daily living, babysitting, being sweet and making and keeping friends, behaving well with others with some recent social isolation and fear of leaving the house, resulting in a conclusion of no acute mental illness and no danger to herself or others (A.R. 16); and the report of therapist Yolanda Rosas in October 2007 that Plaintiff was pleasant and cooperative; Plaintiff had applied for a cashier's job but had failed to show for the interview; Plaintiff wanted to enroll in Bakersfield College but alleged that she was too anxious to pursue it at the admissions office due to chronic anxiety and depression; Plaintiff was reportedly more relaxed by the end of the evaluation and agreed to take the necessary steps to get a background clearance for work in daycare. The ALJ noted the contemporaneous treatment records showing individual therapy and medication management (A.R. 16).

In determining that Plaintiff's impairments did not meet or medically equal a listed impairment (A.R. 17), the ALJ further revealed his evaluation of the medical record and opinion evidence by relying on the failure of any treating or examining physicians to find satisfaction of the requirements of any listing, the failure of any treating physician to impose any marked functional limitations on Plaintiff, the objective mental health findings that were "mild throughout the record," and at least one physician's conclusion that Plaintiff was exaggerating symptoms with the assistance of her mother. (A.R. 17.) The ALJ was necessarily referring to Dr. Lawrence's assessment of Plaintiff's subjective claims and the lay evidence concerning her activities of daily living and interpersonal relationships. The ALJ thus expressly credited the reasoning of Dr. Lawrence, the non-examining state agency physician who placed little probative weight on the activities of daily living forms and instead relied on the inconsistent objective medical evidence. (A.R. 17.) This is consistent with the ALJ's conclusion that Plaintiff had no restriction in activities of daily living or maintaining concentration, persistence, and pace, and

only moderate limitation in social functioning. (A.R. 17.)

The ALJ also reviewed Plaintiff's subjective complaints concerning persistent suicidal ideation, persisting symptoms, impaired concentration, and inactivity. He expressly concluded that Plaintiff's testimony was not generally credible and was not credible to the extent that she alleged an inability to perform any work. (A.R. 18-19.) The Court notes that Plaintiff has not challenged the credibility findings. However, the findings constitute an integral part of the ALJ's evaluation of the evidence. The ALJ expressly concluded that Plaintiff's credibility was undermined by Dr. Lawrence's detailed account of symptom magnification, by the mild findings throughout the record, the many reports of improvement with medication management that were inconsistent with Plaintiff's claim of unrelenting symptoms, and the absence of any exertional limitations. (A.R. 19.) The ALJ credited only Plaintiff's depression-related limitation of engaging only in limited public interaction. (A.R. 19.)

The ALJ expressly evaluated Dr. Obrocea's opinion of October 2007, in which she found moderate or marked impairment in many areas of functioning, by explaining that Dr. Obrocea did not discuss significant clinical findings to support the assessment. Thus, ALJ rejected the assessment because it was not supported by medical findings and the weight of the medical evidence. (A.R. 16.)

An ALJ may disregard a treating physician's opinion that is controverted by other opinions only by setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989). This burden is met by stating a detailed and thorough summary of the facts and conflicting clinical evidence, stating the interpretation of the evidence, and making findings. Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir 1986). It is established that the opinion of a treating physician may be rejected if it is ambiguous and inconsistent or conclusionary in form and not supported by clinical findings or relevant medical documentation. Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

Here, the record supports the ALJ's reasoning concerning the absence of supportive

clinical findings. Further, considering the entire medical record as summarized above, the record supports the ALJ's reasoning that Dr. Obrocea's opinion was not supported by the weight of the medical evidence, which reflected relatively mild objective findings and significant improvement with treatment when there was good compliance with medication.

The ALJ relied on other substantial evidence of record, such as Plaintiff's activities of daily living, Plaintiff's involvement in competitive activities such as softball, and Plaintiff's admitted plans and goals during a treatment record that reflected significant improvement. Plaintiff's activities of daily living have been used as a basis for rejecting the opinion of a treating physician. See Nguyen v. Commissioner of Social Security, 2008 WL 859425, *8 (E.D.CA March 28, 2008).

In discounting Plaintiff's credibility, the ALJ expressly found that Plaintiff engaged in symptom magnification. (A.R. 19.) In so concluding, and in further finding that Dr. Obrocea's opinion was not supported by the medical evidence, the ALJ necessarily concluded that Dr. Obrocea's opinion was based on inflated subjective complaints. It is established that where a treating source's opinion is based largely on the Plaintiff's own subjective description of his or her symptoms, and the ALJ has discredited the Plaintiff's claim as to those subjective symptoms, the ALJ may reject the treating source's opinion. Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

The ALJ thus articulated multiple specific, legitimate reasons, supported by substantial evidence in the record, for rejecting the opinion of the treating psychiatrist. The ALJ reviewed the medical evidence, evaluated whether the opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and concluded that it was not. The ALJ also set forth the body of the substantial evidence in the record and concluded that the opinion was not consistent with it.

Plaintiff argues that the ALJ should have completed another round of analysis, considering additional factors such as the nature and extent of the treatment relationship. The additional factors that are appropriate for such analysis constitute, in large part, the considerations that precipitated the ALJ's conclusions, namely, the amount of relevant evidence

supporting the opinion, the consistency of the opinion with the record as a whole, and the quality of the explanation provided. Even though Dr. Obrocea had a lengthy treatment relationship with Plaintiff, additional analysis of the treatment relationship does not appear to have been warranted because it was made clear by the ALJ's findings that, due to the absence of objective findings and record support for the opinion, and considering the ALJ's conclusions concerning Plaintiff's lack of credibility, the opinion would not be credited.

The Court notes that it is Plaintiff's burden to prove disability; it is not until a claimant establishes that she cannot return to her previous work that the burden shifts to the Commissioner. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990). Here, the ALJ reviewed the evidence and reached conclusions that were supported by substantial evidence. The presence of conflicting evidence does not warrant reversal. Where, as here, evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

Finally, the Court rejects Plaintiff's argument that the ALJ's reasoning was not sufficiently specific. The ALJ here reviewed the medical evidence and specifically set forth his reasoning.

VII.    Disposition

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security,  and against Plaintiff Vicky L. Rodriguez.

IT IS SO ORDERED.

Dated:   **February 10, 2010**                        _____/s/ **Jennifer L. Thurston**_____
_____                                        UNITED STATES MAGISTRATE JUDGE